**WO**                                                                                     JDN

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Galen Lloyd Houser, | No. CV 09-0937-PHX-GMS (ECV) |
| Plaintiff, | **ORDER** |
| vs. | |
| Caron Grant-Ellis, et al., | |
| Defendants. | |

Plaintiff Galen Lloyd Houser brought this civil rights action under 42 U.S.C. § 1983 against Nurse Caron Grant-Ellis and Physician's Assistant Nick Salyer, medical personnel at the Arizona Department of Corrections (ADC) Florence Unit Complex (Doc. 9).[1] Before the Court are Defendants' Motion for Summary Judgment (Doc. 52) and Plaintiff's Motion for Appointment of Counsel (Doc. 64).

The Court will grant Defendants' motion, deny Plaintiff's motion as moot, and terminate the action.

## I.    Background

In his First Amended Complaint, Plaintiff alleged that he suffers from severe psoraisis, and that upon his arrival at the Florence South Unit following hospitalization for his condition, he was supposed to be treated pursuant to a specific treatment plan that

---

[1]Upon screening, the Court dismissed Baird and McMorran as Defendants (Doc. 10).

required medications, blood tests, and constant monitoring (Doc. 9 at 4).[2]  Plaintiff claimed that Defendants failed to provide the prescribed treatment plan or respond to repeated appeals for treatment. Plaintiff alleged that as a result, he suffered painful infections and was rehospitalized (id.).

Defendants now move for summary judgment on the grounds that (1) neither Defendant was deliberately indifferent to Plaintiff's medical needs, (2) Plaintiff did not show a substantial injury, (3) the Eleventh Amendment bars Plaintiff's official-capacity claims, and (4) Plaintiff's punitive damages claim is unsupported (Doc. 52).   Plaintiff opposes Defendants' motion (Doc. 56).

## II.     Legal Standards

### A.      Summary Judgment

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Under summary judgment practice, the movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, that it believes demonstrate the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.

If the movant meets its initial responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 250 (1986) ; see Triton Energy Corp. v. Square D. Co., 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its favor, First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific

---

[2]Plaintiff is currently housed in the Arizona State Prison Complex-Winchester Unit in Tucson, Arizona (Doc. 18).

1  facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v.

2  Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal citation omitted); see Fed. R. Civ. P.

3  56(c)(1).

4      At summary judgment, the judge's function is not to weigh the evidence and

5  determine the truth but to determine whether there is a genuine issue for trial. Anderson, 477

6  U.S. at 249.  In its analysis, the court must believe the nonmovant's evidence, and draw all

7  inferences in the nonmovant's favor. Id. at 255.

8      **B.      Eighth Amendment**

9      To prevail on an Eighth Amendment medical care claim, a prisoner must demonstrate

10  "deliberate indifference to serious medical needs." Jett v. Penner, 439 F.3d 1091, 1096 (9th

11  Cir. 2006) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  There are two prongs to the

12  deliberate-indifference analysis. First, a prisoner must show a "serious medical need." Jett,

13  439 F.3d at 1096 (citations omitted).  A "'serious' medical need exists if the failure to treat

14  a prisoner's condition could result in further significant injury or the 'unnecessary and

15  wanton infliction of pain.'" McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992),

16  overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir.

17  1997) (en banc) (internal citation omitted).  Examples of a serious medical need include

18  "[t]he existence of an injury that a reasonable doctor or patient would find important and

19  worthy of comment or treatment; the presence of a medical condition that significantly

20  affects an individual's daily activities; or the existence of chronic and substantial pain."

21  McGuckin, 974 F.2d at 1059-60.

22      Second, a prisoner must show that the defendant's response to that need was

23  deliberately indifferent. Jett, 439 F.3d at 1096.  This second prong is met if the prisoner

24  demonstrates (1) a purposeful act or failure to respond to a prisoner's medical need and

25  (2) harm caused by the indifference. Id.  Prison officials are deliberately indifferent to a

26  prisoner's serious medical needs if they deny, delay, or intentionally interfere with medical

27  treatment. Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990).  But a delay in

28  providing medical treatment does not constitute an Eighth Amendment violation unless the

1  delay was harmful.  Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989) (citing Shapley

2  v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985) (per curiam)).

3  **III.    Facts**

4  With their summary judgment briefing, the parties each submit an extensive, separate

5  Statement of Facts, which, together, are supported by approximately 400 pages of exhibits,

6  including numerous Health Needs Requests (HNRs) seeking prescription refills and

7  appointments with physicians, who are referred to as health care providers (HCP);[3] medical

8  records, and grievance documents (Doc. 53, Defs.' Statement of Facts (DSOF); Doc. 57, Pl.'s

9  Statement of Facts (PSOF)).  The parties do not dispute many of the factual assertions, which

10  document in great detail Plaintiff's healthcare from 2006-2009 (id.).

11  **A.    Undisputed Facts**

12  The relevant undisputed factual assertions are summarized as follows:

13  Psoriasis is a chronic, non-curable skin condition that causes rapid skin cell

14  reproduction resulting in red, dry patches of thickened skin (DSOF ¶ 4; PSOF ¶ 4).  Psoriasis

15  treatments attempt to interrupt the cycle that causes an increased production of skin cells,

16  thereby reducing inflammation and plaque formation and smoothing the skin.  Treatment

17  usually involves a combination of topical medication—such as corticosteroids—and oral

18  medications—commonly methotrexate (DSOF ¶ 5; PSOF ¶ 5).  Side effects of long-term

19  methotrexate treatment can include liver damage, cancer, and a reduced white blood cell

20  count (DSOF ¶ 6; PSOF ¶ 6).  Regular blood tests are taken to ensure that the drug is safely

21  processed by the liver and blood cells (id.).

22  At the ASPC-Florence South Unit, Salyer was Plaintiff's primary HCP from

23  December 21, 2006 through October 23, 2009, at which time Plaintiff was transferred to

24  another prison complex (DSOF ¶ 16; PSOF ¶ 16).  From 2005 until July 2009, Grant-Ellis

25  was assigned to ASPC-Florence and worked as the Correctional Registered Nurse Supervisor

26  (DSOF ¶ 2; PSOF ¶ 2).

27

28  [3]Physician's assistants—like Salyer—and nurse practitioners are also considered
HCPs (Doc. 53, Ex. B, Grant-Ellis Decl. ¶ 2).

- 4 -

1    With respect to medical care at the South Unit, when an inmate needs non-emergency

2   medical care or treatment, he must fill out an HNR, which is reviewed by the nursing staff,

3   who then either (1) respond as appropriate, (2) make an appointment to the nurses' or

4   doctors' schedule, (3) refer the HNR for a chart review, or (4) refer the HNR for review by

5   an HCP (DSOF ¶ 7; PSOF ¶ 7).

6    When an HCP prescribes a medication, the HCP indicates in his or her notes how

7   many refills are needed, if any (DSOF ¶ 12; PSOF ¶ 12 (in part)[4]).  Then, a nurse faxes the

8   note to the pharmacy, which is responsible for filling the prescription (DSOF ¶ 12).  The

9   pharmacy sends the filled prescription back to the medical unit, and the nursing staff

10  distributes it to the inmate (id.).  If an inmate needs a refill, he must submit an HNR to the

11  pharmacy (id.).  If the inmate needs more medication but does not have a refill, he must

12  submit an HNR to request to see an HCP, who may then reorder the medication (id.).

13   Plaintiff arrived at the South Unit on December 21, 2006 (Doc. 53, Ex. A at 1 (ADC

14  Inmate Record)).  Salyer examined Plaintiff on December 28, 2006; Salyer noted that

15  Plaintiff had been hospitalized for a psoriasis flare prior to his incarceration, but he was now

16  okay (DSOF ¶ 18; PSOF ¶ 18 (in part)).  Plaintiff was already taking methotrexate in

17  subsequently lower doses as well as prednisone—a synthetic corticosteroid drug (id.).  Salyer

18  prescribed methotrexate weekly in subsequently lower doses for four weeks (id.).  He also

19  prescribed psoriasis shampoo; Lidex cream (a topical adrenocortical steroid); triamcinolone

20  (TAC) cream (a topical steroid); Carmol lotion for six months; Pepcid; Tums; extra-strength

21  Tylenol; and Phenergan (id.).  Salyer further ordered that blood tests be done in four to six

22  weeks (id.).

23   During the next three years, Salyer continued to prescribe these medications to

24  Plaintiff in varying doses, and at different times he also prescribed ointments, Flexeril,

25

26      [4]In his PSOF, Plaintiff states that he disagrees with DSOF ¶ 12 (PSOF ¶ 12).  But he

27  does not explicitly dispute the prison's established process for prescribing, filling, and
    refilling prescriptions.  Instead, Plaintiff asserts that if there is a problem related to the

28  pharmacy, and prison medical staff are aware of the problem but take no corrective action,
    it constitutes a denial of treatment (id.).

1  Kenalog (a steroid injection), Medrol Dosepack (an oral steroid), prednisone, antibiotics,

2  Prilosec, Meclomen (an anti-inflammatory drug), Inderal (a beta-blocker), and Cafergot (for

3  migraines) (see DSOF ¶¶ 23, 29, 37, 48, 54, 61, 69, 80; PSOF ¶¶ 23 (in part), 29, 37 (in part),

4  48 (in part), 54, 61, 69, 80 (in part)).

5  Plaintiff regularly submitted HNRs requesting prescription refills for these various

6  medications; he averaged 2-5 HNRs for refills per month (DSOF ¶¶ 20, 24, 30, 39, 44, 47,

7  59, 63, 65, 70, 75, 79, 81; PSOF ¶¶ 20, 24, 30, 39, 44, 47, 59, 63, 65, 70, 75 (in part), 79, 81

8  (in part)).   Plaintiff also regularly submitted HNRs requesting to see a physician about

9  renewing medications (DSOF ¶¶ 26, 33, 73, 85; PSOF ¶¶ 26 (in part), 33, 73, 85); because

10 his medications were not being filled as ordered (DSOF ¶ 22; PSOF ¶ 22); he was not getting

11 refills (DSOF  ¶¶ 38, 42, 44, 88, 90; PSOF ¶¶ 38, 42, 44, 88, 90); and he was not receiving

12 blood tests as ordered (DSOF ¶¶ 34, 36 38, 42, 68; PSOF ¶¶ 34, 36, 38, 42, 68 (in part)).

13 On December 27, 2007, Plaintiff was admitted to St. Mary's Hospital (DSOF ¶ 52;

14 PSOF ¶ 52).  He was discharged three days later after treatment for a suspected migraine,

15 abdominal pain, psoriasis, and anemia (id.).

16 **B.     Disputed Issues**

17 The parties dispute whether Grant-Ellis was responsible for determining which

18 inmates were approved for the one-day-a-week doctors' schedule and whether she was aware

19 of the allegedly inadequate supply of medications and treatment for Plaintiff but disregarded

20 the problem (Doc. 56 at 2).  They also dispute whether Salyer was aware of the allegedly

21 inadequate supply of medications and treatment for Plaintiff, whether he failed to take any

22 corrective action to address the situation or establish a new drug treatment, and whether

23 Salyer maintained Plaintiff's treatment plan or took any action to address the lack of blood

24 testing (id.).

25

26 **IV.     Analysis**

27 The Court notes that Defendants make no argument that Plaintiff did not suffer from

28 a serious medical need.  See Jett, 439 F.3d at 1096.  Indeed, Defendants' own evidence

1   reflects that Plaintiff's condition warranted ongoing treatment, including prescription

2   medication and regular blood testing.  Thus, the deliberate-indifference analysis turns on

3   whether Grant-Ellis and Salyer were deliberately indifferent to Plaintiff's serious medical

4   need.

5           **A.      Grant-Ellis**

6           In her declaration, Grant-Ellis states that as the Correctional Registered Nurse

7   Supervisor, she was responsible for staffing and overseeing subordinate nursing staff and she

8   performed health assessments and triage of patients (Doc. 53, Ex. B, Grant-Ellis Decl. ¶ 2).

9   Her duties included referring inmates to be seen by HCPs; however, she did not actually

10  schedule inmates to be seen by an HCP (id.).  But if an inmate had an emergency or a critical

11  medical need, Grant-Ellis could add the inmate to the doctors' schedule for immediate

12  treatment depending on the severity and urgency of the need (id. ¶ 5).  In her position, she

13  did not dictate inmate medical care, order lab work, or prescribe medications (id. ¶ 3).

14          As to her involvement with Plaintiff's care, Grant-Ellis declares that it was limited.

15  She reviewed Plaintiff's HNR for refills in December 2006, and reviewed his chart a few

16  days later, at which time she sent his prescriptions to the pharmacy and sent the blood work

17  order to the lab (id. ¶¶ 9-10).  In August 2007, she noted in Plaintiff's medical record that he

18  requested a renewal of two medications, and she placed his chart for review by an HCP (id.

19  ¶ 11).  Grant-Ellis states that she saw Plaintiff on December 6, 2007, and he complained

20  about his deteriorating psoriasis and improper methotrexate regimen; she referred him for an

21  HCP appointment (id. ¶ 12).  Around that same time, in early December 2007, Grant-Ellis

22  responded to a CO III who was investigating an inmate letter/grievance that Plaintiff filed

23  about medication; she told the CO III that she tried to call the pharmacy and got no answer

24  but she would contact the pharmacy again (id. ¶ 13).  On December 12, 2007, following

25  Plaintiff's appointment with an HCP, Grant-Ellis reviewed Plaintiff's chart and confirmed

26  that his prescriptions were sent to the pharmacy (id. ¶ 14).  She also responded to Plaintiff's

27  inmate letter regarding the lack of TAC for two weeks in late December 2007 (id. ¶ 15).

28  Finally, once in March 2008 and once in February 2009, Grant-Ellis received HNRs from

- 7 -

1   Plaintiff for refills; she faxed them both to the pharmacy (id. ¶¶ 16-17).

2   Defendants argue that this evidence precludes any finding of deliberate indifference

3   by Grant-Ellis (Doc. 52 at 6).

4   In response, Plaintiff cites to his First Amended Complaint and reiterates his claim

5   against Grant-Ellis; specifically, that he complained to her about his medication

6   approximately 10 times and that she scheduled inmates to see HCPs for emergencies and

7   general care (Doc. 56 at 8-9).  According to Plaintiff, the evidence shows that Grant-Ellis

8   controlled who saw physicians and that she scheduled inmates "as it pleased her" (id. at 9).

9   He further contends that she ignored the problems with blood work lab orders and

10  prescription medication (id.).  Lastly, he asserts that Grant-Ellis had more than limited

11  contact with Plaintiff; he states that she regularly handled his medical records and

12  prescription orders and failed to correct the problems that she knew existed with his

13  treatment (id.).

14  Plaintiff does not point to any specific documents within the hundreds of pages in the

15  record to support these contentions.  On summary judgment, the Court is "not required to

16  comb the record to find some reason to deny a motion for summary judgment." Carmen v.

17  San Francisco Unified Sch. Dist., 237 F.3d 1026, 1029 (9th Cir. 2001) (citation omitted);

18  Fed. R. Civ. P. 56(c)(3); see Huey v. UPS, Inc., 165 F.3d 1084, 1085 (7th Cir. 1999) ("judges

19  need not paw over the files without assistance from the parties").  Nonetheless, in giving

20  Plaintiff the benefit of any doubt, the Court has reviewed the documents Plaintiff submitted

21  and finds that copies of HNRs show that on a number of occasions, he did not receive timely

22  refills; that sometimes he had to make repeated written requests for the same medication

23  refills; and that sometimes he went days or weeks without some medications due to delays

24  (see e.g., Doc. 57, Attachs. 11, 13-16).  Defendants do not refute Plaintiff's claims regarding

25  these delays (see Doc. 61), and none of their evidence appears to show when prescription

26  medication was distributed to Plaintiff after it was filled by the pharmacy and sent to the

27

28

1    medical unit (see Doc. 53, DSOF ¶7).[5]

2           Plaintiff's evidence also includes a number of grievance documents.  In a February

3    2008 grievance response, the Facility Health Administrator acknowledged Plaintiff's

4    concerns about staff conduct and demeanor and informed Plaintiff that he will remind staff

5    "of the need to conduct themselves in a professional manner regarding patient care and

6    interactions" (id., Attach. 25).   In an April 2008 grievance response, prison staff

7    acknowledged that there was a previous mistake with Plaintiff's medication order (id.,

8    Attach. 21).  There are a number of documents that specifically refer to Grant-Ellis: (1) in

9    a December 4, 2007 grievance, Plaintiff complained that Grant-Ellis permitted delays and

10   interruptions in the receipt of his prescription medications (id., Attach. 11); (2) in an April 1,

11   2008 grievance document about failure to receive prescribed methotrexate and the lack of

12   blood testing, Plaintiff wrote that he discussed the issue with Grant-Ellis (id., Attach. 14);

13   (3) in a February 2009 grievance, Plaintiff complained that dosages were incorrect and he

14   had not received methotrexate, and he wrote that he discussed these problems with Grant-

15   Ellis (id., Attach. 20); (4) in a March 9, 2009 grievance, Plaintiff wrote that Grant-Ellis

16   confirmed that refill orders were handled improperly (id.); and (5) in a August 31, 2009

17   grievance, Plaintiff wrote that Grant-Ellis failed to order his prescription cream (id., Attach.

18   24).

19          Viewing this evidence in the light most favorable to Plaintiff, Grant-Ellis was aware

20   or should have been aware of some of the problems Plaintiff encountered when trying to

21   obtain medication refills.  But there is no evidence that Grant-Ellis was aware of every

22   delayed refill and blood test or that she should have been aware of these problems but refused

23   to acknowledge them.  Moreover, the evidence shows that, at least on some occasions, she

24   responded to Plaintiff's concerns.  In response to the December 2007 grievance, Grant-Ellis

25   contacted the pharmacy twice to follow-up on Plaintiff's refill (id., Attach. 11; Doc. 53, Ex.

26   B, Grant-Ellis Decl. ¶ 13).  To the extent that Grant-Ellis may not have timely responded to

27

28          [5]The HNR forms show only the date that a request for refill was faxed to the pharmacy
     (see e.g., Doc. 53, Attachs. 11, 19).

- 9 -

1  some of the other refill delays, Plaintiff proffers no evidence that her conduct was more than

2  negligent, which is not actionable under § 1983.  Toguchi v. Chung, 391 F.3d 1051, 1060-61

3  (9th Cir. 2004) (neither medical malpractice nor negligence is sufficient to establish a

4  constitutional violation); O'Loughlin v. Doe, 920 F.2d 614, 617 (9th Cir. 1990) (isolated

5  occurrences of neglect may constitute grounds for malpractice but they do not amount to a

6  constitutional violation).

7          Plaintiff alleges that he suffered infections on his leg due to delays in and interruption

8  of medication treatment, and he claims that had Grant-Ellis taken proper action and had he

9  received medications without interruption, he would not have been hospitalized in late

10  December 2007 (Doc. 56 at 12).  But, again, Plaintiff does not cite to any specific evidence

11  in the record to support this claim.  The records show that Grant-Ellis saw Plaintiff on

12  December 6, 2007; she states that she referred Plaintiff for an appointment with an HCP,

13  which occurred on December 12, 2007 (Doc. 53, DSOF ¶¶ 45, 48).  Plaintiff disputes that

14  the HCP appointment resulted from Grant-Ellis' referral; he claims that it occurred in

15  response to his grievance (Doc. 57, PSOF ¶¶ 45, 48).  Even assuming that Grant-Ellis did not

16  set up the appointment with the HCP, it is immaterial because Plaintiff did see the HCP, and

17  Plaintiff does not dispute that Grant-Ellis reviewed Plaintiff's chart following that

18  appointment and sent his prescriptions to the pharmacy (Doc. 53, DSOF ¶ 49; Doc. 57, PSOF

19  ¶ 49).  Further, the hospital medical records do not include any information suggesting that

20  a disruption of medication or other delays in care led to the need for hospitalization (Doc. 57,

21  Attach. 12).  Plaintiff's sweeping, conclusory allegations that Grant-Ellis' conduct led to his

22  hospitalization are insufficient to defeat summary judgment.  See Rizzo v. Goode, 423 U.S.

23  362, 371, 377 (1976) (there must be an affirmative link between a defendant's action and the

24  claimed deprivation); Leer v. Murphy, 844 F.2d 628, 634 (9th Cir. 1988) (to establish

25  deliberate indifference, the prisoner must establish individual fault).

26          On the record before the Court, there is no competent evidence to support Plaintiff's

27  general allegation that Grant-Ellis "knowingly and deliberately limit[ed] [Plaintiff's] access

28  to health care and failed to correct problems which she did know existed" (Doc. 56 at 9).

1  Carmen, 237 F.3d at 1028 ("a plaintiff's belief that a defendant acted from an unlawful

2  motive, without evidence supporting that belief, is no more than speculation or unfounded

3  accusation about whether the defendant really did act from an unlawful motive").   The

4  summary judgment determination cannot be based on unsupported allegations and

5  speculation. See id.; Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).  Accordingly,

6  although the Court is troubled by the difficulties that Plaintiff encountered when seeking

7  medication refills, there is no probative evidence to establish a genuine issue of material fact

8  that Grant-Ellis was deliberately indifferent to Plaintiff's medical needs.

9       **B.    Salyer**

10      During his time as Plaintiff's primary HCP from December 2006 through October

11  2009, Salyer examined Plaintiff seven times (Doc. 53, DSOF ¶¶ 18, 23, 29, 37, 48, 69, 80;

12  Ex. C, Salyer Decl. ¶ 10).[6]  The parties dispute whether some of these examinations were set

13  up in response to Plaintiff's HNRs requesting to see an HCP—as Defendants suggest, or in

14  response to Plaintiff's initiation of the grievance process regarding his inability to get

15  medical care—as Plaintiff claims (Doc 57, PSOF ¶¶ 23, 37, 48).  The Court agrees with

16  Defendants that this dispute is immaterial (see Doc. 61 at 2).  And, notably, Plaintiff does not

17  dispute Defendants' description of the HNR process for inmates seeking medical care nor

18  does he set forth any allegations challenging that process as unconstitutional (see Doc. 53,

19  DSOF ¶ 7; Doc. 57, PSOF ¶ 7).

20      At issue is whether Salyer was aware of the difficulties and repeated delays in

21  obtaining medication refills and blood tests and whether he failed to respond to those

22  problems.  First, as to Plaintiff's blood tests, the evidence shows that there were just a few

23  times when he did not receive regular testing. Defendants submit copies of all the lab reports

24  during the relevant time, which show that through 2007, there were just two gaps between

25  blood tests that exceeded one month; otherwise, Plaintiff had testing done every month (Doc.

26

27

28      [6]Those examination dates were December 28, 2006; January 29, 2007; March 22,
   2007; September 10, 2007; December 12, 2007; July 9, 2008; and March 2, 2009 (Doc. 53,
   DSOF ¶¶ 18, 23, 29, 37, 48, 69, 80).

1    53, Ex. B, Attachs. 3, 7, 10, 12, 20-21, 23, 27 (gaps were from April 24 to July 21, 2007, and

2    from July 21, to September 15, 2007)).  In 2008 and 2009, blood tests were administered

3    approximately every 2-3 months (id., Attachs. 31, 40, 47-48, 53, 57, 63).  Salyer declares that

4    he reviewed the lab reports for each of Plaintiff's blood tests (id., Ex. C, Salyer Decl. ¶¶ 13,

5    17, 20, 23, 28, 31, 34, 43, 50-51, 58-59, 64, 68, 75).  Plaintiff does not dispute any of this

6    evidence (see Doc. 57, PSOF ¶¶ 21, 25, 28, 31, 40-41, 43, 55, 62, 71-72, 77, 82, 89).

7    Plaintiff asserts that, at times, to get his blood tests done, he had to initiate the grievance

8    process (Doc. 56 at 1; Doc. 57, Attachs. 10-11, 14, 16, 17).  While that may have been the

9    case, Plaintiff nonetheless received regular blood tests to monitor whether methotrexate was

10   affecting his liver or blood cells, and Salyer reviewed those test results.  Notably, there is no

11   evidence that Plaintiff experienced liver damage or a reduced white blood cell count in

12   response to the methotrexate treatment and that these symptoms were missed or ignored due

13   to inadequate blood testing.

14          As mentioned, Plaintiff's evidence reflects that he regularly encountered delays in

15   obtaining refills of his medication.  Plaintiff asserts that at each appointment with Salyer,

16   they reviewed the HNRs together, and Plaintiff complained about the delays and inadequate

17   supply of medication.  Plaintiff states that Salyer simply rewrote new prescriptions and

18   avoided addressing the medication problem with Grant-Ellis (Doc. 56 at 9-10).  Plaintiff

19   further alleges that Salyer responded to Plaintiff's concerns by stating that he was sorry but

20   he had done his job and "after its out of my office, its not my problem" (id. at 10).

21          In his declaration, Salyer acknowledges that when he examined Plaintiff, Plaintiff

22   often expressed his concerns about the pharmacy's failure to renew prescriptions and that he

23   was not getting some medications (Doc. 53, Ex. C, Salyer Decl. ¶¶ 15, 21, 56, 66).  Salyer

24   also refers to all of Plaintiff's HNRs requesting refills, some of which complain about late

25   refills and/or the lack of medication due to delays (see e.g., id. ¶¶ 14, 22, 29, 37, 62).  The

26   inference from this evidence is that Salyer was aware of Plaintiff's recurrent difficulties in

27   obtaining refills of his prescription medication.  There is no indication that Salyer followed-

28   up with the pharmacy or confronted Grant-Ellis about the refill delays, as Plaintiff felt he

1

2

3

should have done.  The record appears to support Plaintiff's claim that in response to his concerns, Salyer often just wrote new prescriptions for medication (id. & Attachs. 5, 9, 45, 55).

4

5

6

7

8

9

10

Arguably, Salyer may have been able to do more to address apparent problems with the medication refills; however, there is no evidence that Salyer disregarded Plaintiff's medical needs.  Plaintiff's medical records reflect that Salyer re-issued prescriptions when necessary; that he monitored Plaintiff's condition, noting when his psoraisis started to flare (id., Salyer Decl. ¶¶ 15, 66, Attachs. 5, 55) and when it was greatly improved (id. ¶¶ 21, 65, Attachs. 9, 45); and that he adjusted Plaintiff's treatment accordingly (see id. ¶¶ 15, 66, 21, 65).

11

12

13

14

15

16

17

18

19

20

Assuming, arguendo, that Salyer's failure to do more to address the medication delays raised a question as to deliberate indifference, Plaintiff must still show that harm resulted from Salyer's failure to act. See Jett, 439 F.3d at 1096.  He does not have to demonstrate that his harm was substantial, as Defendants argue (see Doc. 52 at 7).  See id.; McGuckin, 974 F.2d at 1059 ("a finding that the defendant's activities resulted in 'substantial' harm to the prisoner is not necessary").  But he must establish that the harm suffered was not an "isolated exception" to the overall treatment he received during the time Salyer was treating him. Jett, 439 F.3d at 1096 (if harm "is an 'isolated exception' to the defendant's 'overall treatment of the prisoner [it] ordinarily militates against a finding of deliberate indifference'") (internal citation omitted).

21

22

23

24

25

26

27

28

Plaintiff's general allegations that he suffered "pain and suffering" and harm as a result of the medication interruptions and delays are insufficient to establish a genuine issue of material fact (see Doc. 9 at 4; Doc. 56 at 12).  See Celotex, 477 U.S. at 324 (nonmovant must "go beyond the pleadings . . . and designate specific facts showing" a material factual dispute).  The only specific harm Plaintiff identifies is his hospitalization in December 2007. With respect to his assertion that delays in medication resulted in the hospitalization, the HNRs that Plaintiff filed in the last few months of 2007 show that the only medication he did not consistently receive was TAC cream and that he went three weeks without it in

- 13 -

1    November (Doc. 53, Ex. C, Attachs. 19 (HNRs dated Sept. 11, Oct. 20, Nov. 6, 13), 26 (HNR

2    dated Dec. 5)).  Plaintiff specifically asserts that when he saw Salyer on December 12, 2007,

3    Salyer responded by prescribing various medications to try to bring the psoriasis under

4    control (Doc. 56 at 12).

5         As discussed above, the hospital medical records do not indicate that a lack of TAC

6    cream or any other medication led to the need for hospitalization (Doc. 57, Attach. 12), and

7    there is no other evidence in the record that suggests any such connection.  See Hutchinson

8    v. United States, 838 F.2d 390, 393 (9th Cir. 1988) (in medical cases where the plaintiff

9    contests the type of treatment he received, an expert opinion will almost always be necessary

10   to establish deliberate indifference).  Plaintiff's conclusory allegations cannot create a

11   material factual dispute, and the fact that Salyer responded to Plaintiff's needs precludes a

12   finding of deliberate indifference.  See Farmer, 511 U.S. at 837; Leer, 844 F.2d at 634.  The

13   Court will therefore grant Defendants' Motion for Summary Judgment.

14        Defendants' arguments pertaining to the Eleventh Amendment and damages need not

15   be addressed, and Plaintiff's motion for counsel will be denied as moot.

16   **IT IS ORDERED:**

17   (1) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for

18   Summary Judgment (Doc. 52) and Plaintiff's Motion for Appointment of Counsel (Doc. 64).

19   (2) Defendants' Motion for Summary Judgment (Doc. 52) is **granted**.

20   (3) Plaintiff's Motion for Appointment of Counsel (Doc. 64) is **denied** as moot.

21   (4) The Clerk of Court must terminate this action and enter judgment accordingly.

22   DATED this 27th day of May, 2011.

23

24   *A. Murray Snow*

25   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     G. Murray Snow
26   United States District Judge

27

28

- 14 -